IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

Christine Alicea,                              :

                    Plaintiff         :      Case No. 2:13-cv-0300

         v.                           :      Judge Watson

Corolyn W. Colvin, Acting             :      Magistrate Judge Abel
Commissioner of Social Security,
                                      :
                    Defendant
                                      :

**REPORT AND RECOMMENDATION**

Plaintiff Christine Alicea brings this action under 42 U.S.C. §§405(g) for review of a final decision of the Commissioner of Social Security denying her applications for social security disability, supplemental security income, and child insurance benefits. This matter is before the Magistrate Judge for a report and recommendation on the administrative record, plaintiff's merits brief and defendant's memorandum in opposition.

**Summary of Issues.** In June 2010, plaintiff Christine Alicea filed her applications for social security disability, supplemental security income, and child insurance benefits alleging that she had been disabled by mental retardation and depression with psychotic features since January 1983, when she was seven years old. She was 35 years old at the time of the hearing before the administrative law judge, but Alicea had never engaged in substantial gainful employment. The administrative law judge found that Alicea's severe impairments were polysubstance abuse disorder, in reported remission, a major depressive disorder with psychotic features, and borderline intellectual func-

tioning. Her borderline intellectual functioning did not meet or equal Listing 12.05 because there was no evidence of deficits in adaptive functioning. He further found that plaintiff had no physical limitations and could perform jobs that had simple, routine, low-stress tasks that did not involve arbitration, negotiation, confrontation, directing the work of others, or being responsible for the safety of others and did not involve work in a fast-paced production environment.

Plaintiff argues that the decision of the Commissioner denying benefits should be reversed because:

- She meets the requirements of Listing 12.05C.
- The administrative law judge failed to give sufficient weight to the opinion of Dr. Rodio, Alicea's treating psychiatrist.

**Procedural History.**  Plaintiff Christine Alicea filed her applications for disability insurance benefits on June 23, 2010, alleging that she became disabled on January 1, 1983, at age seven, by a learning disability and depression. (Tr. 194-96, 202-03, 206-07, and 243.) The applications were denied initially and upon reconsideration.  Plaintiff sought a *de novo* hearing before an administrative law judge.  On November 2, 2011, an administrative law judge held a hearing at which plaintiff, represented by counsel, appeared and testified.  A vocational expert also testified.  (Tr. 26-55.) On January 24, 2012, the administrative law judge issued a decision finding that she was not disabled within the meaning of the Act. (Tr. 12-21.) On February 20, 2013, the Appeals Council denied plaintiff's request for review and adopted the administrative law judge's decis-

ion as the final decision of the Commissioner of Social Security. (Tr. 1-3.)

**Age, Education, and Work Experience.** Christine Alicea was born December 20, 1975. (Tr. 194.)  She completed the sixth grade in special education classes. (Tr. 244.) She has worked a number of jobs in fast food restaurants and factories, but has never engaged in substantial gainful activity. The most she has earned in a year is just over $5,800. (Tr. 215-221.)  She last worked for less than a month in January 2008 as a cashier at a McDonald's. She worked 10-20 hours a week from April 2006 to May 2007 as a cook, cashier, and cleaner at a McDonald's. (Tr. 225.)

**Plaintiff's Testimony.** Christine Alicea testified that she attended school to the sixth grade in special education. (Tr. 32-33.) She left school because her mother did not want her to take the bus alone. (Tr. 34.) She has difficulty with reading, writing, and math. She can only read a little bit.  Sometimes she has problems reading, and "everything goes blurry . . . and I get frustrated with it." (Tr. 33.) She is supposed to wear glasses, but does not. (*Id*.) She is slower than others. (Tr. 37-38.) She also testified to suffering from depression and anxiety. She is easily overwhelmed. (Tr. 40.) She takes Prozac and Valium, which sometimes helps. (Tr. 42.)

Alicea testified that she had three children, ages 18, 14, and 15. Her sister took over their care "because I'm not in a stable place right now, and she feels that my disability is going to get in the way of [her] being with [her] kids." (Tr. 37.) At one time, Alicea had lived for a couple of months on her own with her children but she had problems keeping up with the rent and the bills. She was suffering from stress and depress-

3

ion. "It's too much on me." (Tr. 38.) She said she paid her bills with her daughter's SSI check. Her sister took her to cash the check, then used the money to pay her bills. (*Id.*) During that time, her sister would take her to the bank to cash her check and then her sister would take over the money to pay the bills. (*Id.*) Alicea testified that her sister has always helped her out. (Tr. 39.) Now she has sporadic visits with her children. One daughter's father told her that she doesn't need to see her because it just makes her (Alicea) more depressed.(Tr. 42.)

Alicea testified that she lives with a friend and her mom. She does not shop alone, but always with her friend and her mom. (Tr. 33-34.) Her friend also takes her doctor appointments. She is scared to be around other people because they "make fun of me and stuff." (Tr. 43.) Alicea testified that she never had a driver's license and has never taken a driver's license test. She can take public transportation, but she has gotten lost in the past. (Tr. 43-44.)

Alicea testified that she worked full-time at McDonald's for one year as a cashier.[1] During that time, she was told to pick up the pace and keep up with orders. She kept making mistakes with orders and money. She testified she quit because she felt her "disability was getting in the way of my work, and I had problems with the customers" and the manager complaining that she gave back the wrong change, gave the wrong order, and was not keeping up with the pace of the work. (Tr. 35.) Alicea also worked

---

[1]In her disability application, Alicea said that during 2006 she worked 10-20 hours a week at McDonald's. She earned a little over $5,800 that year. (Tr. 219.)

4

with her sister at a franchise packing operation. Her sister had to help with the order packing and telling Alicea what to do. (Tr. 35-36.)

Alicea testified that she is on probation because her nephew talked her into breaking into her boyfriend's house. (Tr. 39.) She testified that she is easily persuaded by others. She can be talked into doing things that she doesn't want to do. (*Id*.) Alicea testified that, since she has been on probation, she stopped drinking alcohol. (Tr. 40.) She testified that alcohol was a one-time thing. She drank a bottle of Jack Daniels with her friend because she was easily talked into doing it. (Tr. 47.) She had no problem stopping alcohol. (*Id*.) Similarly, she had no problem stopping cocaine when the court ordered it. (Tr. 46.)

Alicea said that beyond drug abuse, her problems were depression and anxiety attacks. "Stress, pressure into doing things" can cause her to become overwhelmed and get real nervous. (Tr. 40.) As an example, Alicea testified that "my friend, she wants me to do everything for her, and I can't do it, and I get like, real overwhelmed about it, and I start to have problems with having anxiety, and I go upstairs in my room, and I stay by myself." (Tr. 41.) Her friend expects Alicea to clean, do dishes, and take the dog out. Sometimes she feels like "I can't do it, I don't want to do it, . . . it's like something else tells me, you know, 'Don't do it, don't do it,' and I get real bad depression." (*Id*.) So every day she stays in her room by herself. She doesn't see anyone other than her friend and the friend's mother she lives with. (*Id*.) She takes Prozac and Valium. (Tr. 42.)

5

**Medical Evidence of Record.**  The administrative law judge's decision fairly sets out the relevant medical evidence of record, but, nonetheless, this Report and Recommendation will summarize that evidence in some detail. There is no evidence of a physical impairment.

**Psychological Impairments.**

**Mitchell Wax, Ph.D.**  On October 4, 2010, Dr. Wax performed a disability evaluation for the Commissioner. He diagnosed malingering.

Alicea told Dr. Wax that her last relationship ended in 2009. She had three children, ages 16, 14, and 13. The older children lived with her sister, and the youngest with his father. She did not have custody of her children, and she saw them once a month. She said, "I can't take care of my kids, I'm not in a stable home situation. My sister has custody, I move from place to place." (Tr. 287.) Alicea was then living with her friend Kimberly Gomez and Gomez's mother. Both Ms. Gomez and her mother received Social Security disability benefits. When questioned about her sources of income, Dr. Wax concluded that "she seemed to make up information that other friends and her friend's brother who works give her money. The claimant though could not say who these people were or how much she receives from them." (*Id.*)

Alicea was 5'6" tall and weighed 181 pounds. She was clean and neat. She made a good appearance. Plaintiff told Dr. Wax that she could not work because of daydreaming and an inability to focus. She  reported having no psychiatric hospitalizations, no psychiatric care, and no counseling.

6

Alicea denied using illegal drugs but admitted to abusing alcohol. She said that she last worked in 2005 as a cashier for McDonald's. She was fired because her sister was harassing her at work. She came in and demanded free food. She also said that she was fired because she couldn't focus on work. (Tr. 288.)

Dr. Wax described Alicea as "a pleasant anxious woman who was trembling during the evaluation." (*Id*.) Although she complained of difficulty focusing and attending, "She was able to focus and attend to provide information about herself." (*Id*.) She did appear to be sad during the evaluation. (Tr. 290.) She believed that if she had enough money she could live autonomously on her own. Her motivation was marginal. She "appear[ed] to be functioning at a much higher level than [her WMS-IV] scores indicate." (Tr. 288.)

Alicea's speech was slow, and the content of what she said was "at times vague and circumstantial." (*Id*.) "She reported having no difficulty with feelings of helplessness, hopelessness, or worthlessness . . . ." (*Id*.) Her energy was only fair. Although Dr. Wax noted intermittent body trembling, Alicea said that she had no difficulty with trembling, fidgeting, or pacing. She daydreamed a lot and complained of problems concentrating. She got angry every day, having arguments with family and friends. There was no evidence of delusions, although she said she heard voices. There was no evidence of mental confusion. During the interview, Alicea was alert and able to concentrate. She was oriented as to person, place, time and situation. Her memory for past, recent and current events was marginal. She did not know the governor of Ohio or

7

mayor of Cleveland, but did know the current and immediate past president. She could recite her age, birthday, and Social Security number. During tests involving repeating digits forwards and backwards, remembering three simple words, and performing mathematical calculations, Dr. Wax believed Alicea "appeared to intentionally answer questions incorrectly." (289.)

When asked about her daily activities, Alicea said she went to bed at 7:00 p.m. and got up at 11:00 a.m. She cooked a meal twice a week, but otherwise made sandwiches. She bathed and changed her underwear daily. She washed dishes and did house cleaning daily. Her housecleaning included vacuuming, mopping, and cleaning the bathroom. She did laundry twice a week. Otherwise, Dr. Wax found plaintiff "suspiciously vague about how she spends a typical day." (Tr. 290.) She watched TV 4-5 hours a day. She did not do any grocery shopping. She babysat a nine month old child when her friend's brother and his wife, who live in the same house, go out. (*Id*.)

Alicea can read, and she reads a garden magazine once a week. Gardening is her major interest. She helps her friend's mother garden during the summer.(*Id*.)

WAIS-IV testing was invalid, because plaintiff "appeared to be functioning at a much higher level than test results indicate." (*Id*.) Plaintiff appeared to have more difficulty concentrating during the testing than during the clinical interview. During testing she spoke in a nearly inaudible monotone and displayed poor attention and concentration. "She appeared to have difficulty understanding simple instructions, and needed them repeated several times. She yawned a lot, but could not say why she was tired."

8

(*Id*.)

Dr. Wax concluded that he could not determine plaintiff's abilities to relate to others, understand, remember, and follow instructions, maintain attention, concentration, and persistence, and withstand the stresses and pressures associated with day to day work activity because of malingering. (Tr. 291-92.)

**Cynthia Waggoner.** On November 1, 2010, a state agency consultant, Cynthia Waggoner, Psy.D., reviewed Alicea's file. It was Dr. Waggoner's opinion that there was insufficient evidence to determine the severity of Alicea's allegations. (Tr. 59-60, 65-66, 71-72.)

**James Rodio, M.D. and treatment at Recovery Resources.** Alicea first sought treatment for drug abuse and depression after she was convicted of attempted burglary and referred by her parole officer to Recovery Resources for drug treatment and mental health services. (Tr. 302.) Dr. Rodio is Alicea's treating psychiatrist at Recovery Resources.

On December 8, 2010, Dr. Rodio conducted a psychiatric evaluation of Alicea. (Tr. 297-298.) Alicea was referred to the program after being placed on probation for two years after a failed break-in at her ex-boyfriend's house resulted in her conviction for attempted burglary. (Tr. 297.) She had reported to Dr. Arnoff at Court Clinic that she experienced periods of depression marked by crying, social withdrawal, decreased self-esteem, and loss of appetite. She said the depression started because she had not had custody of her children over the past five years. She has cut her left forearm repeat-

edly with a razor "to get the pain away from all the depression and aggravation, I feel that everybody hates me." (*Id.*) She has heard voices since her 20s. (*Id.*)

Alicea did not have a history of psychiatric treatment. However, during periods of depression, she would cut her left forearm with a razor. Alicea also reported a pattern of auditory hallucinations since her twenties. She said that she had repeated the fifth grade and left school in the sixth grade. She had not obtained a GED. A court clinic IQ testing yielded a score of 55. She had worked briefly in a factory, but most recently in 2006 at McDonald's. (*Id.*) She was fired because her "boyfriend was 'stalking me' at work." (Tr. 297-98.) She had three children from three fathers. A daughter and a son lived with her sister, and another daughter lived with her father. She had limited visits with them. (Tr. 298.)

During the clinical examination, Alicea's speech was plain and somewhat monotone. Her thoughts were linear. She  reported "some current residual voices which make her feel 'a little jittery, it makes me want to get up, but I try to stay cool.'" (*Id.*) She felt depressed. She denied being suicidal. The mental status examination found that:

> She is alert and oriented to day, date, month and year. She recalls 2/3 items. In a test of her concentration, she says the months of the year backwards: DN...O... 'I can't focus on the other ones,' in trying to remember the 3 items. She is readily abstract with 2 proverbs.

(*Id.*) Dr. Rodio diagnosed major depressive disorder with psychotic features, cocaine dependence and alcohol abuse and gave a GAF score of 60. (*Id.*)

In a progress noted dated January 24, 2011, Alicea reported that she slept better

10

and heard less voices when she took her medication. She still had periods of depression. "A male friend thought she was less irritable and able to speak more consistently on medications."(Tr. 295.) She could feel distracted and anxious. She felt people were against her. She felt "'depressed and stressed out,' pressured with housemates (9 people in her friend's mother's house - 'I think there's too many people' and is looking for alternatives) 'arguing with me over little stuff'." She had "an inclination to isolate." (*Id.*)

On January 24, 2011, Dr. Rodio completed a report for the Bureau of Disability Determination. (Tr. 303-306.) He reported that Alicea had adequate hygiene, psycho-motor retardation, restricted affect and impaired concentration/memory. She was compliant with her prescribed medications. (Tr. 304.) Dr. Rodio reported that Alicea's ability to remember, understand and follow directions was adequate for short term but impaired in her long term capacity. She was distracted by hallucinations, anxiety and depression. She functions with basics for limited periods. She is anxious and socially withdrawn. She has a limited capacity for novelty. Her depression would be heightened with pressures in a work setting involving simple, routine or repetitive tasks. In that setting, she would also have a higher risk to have increased hallucinations and mis-interpret events. (Tr. 305.)

On January 28, 2011, Sarah Stull  reported that she had seen Alicea only once because she missed appointments. (Tr. 307.) She was supposed to be seen once a week, but never came to case management appointments. She did take her prescribed medica-tions and had no behavior issues. (Tr. 308.)

On March 14, 2008, Dr. Rodio completed a second report for the Bureau of Disability Determination. (Tr. 310-312.) He diagnosed major depression with psychotic features which had been present for more than 10 years. He said that Alicea's ability to remember, understand and follow directions was adequate for basics of brief duration, but her anxiety prevented sustained consistent effort. Her ability to maintain attention was impaired due to anxiety and hallucinations. She would have limited productivity in her ability to sustain concentration, persist at tasks and complete them in a timely fashion due to anxiety. Dr. Rodio further reported that Alicea was extremely sensitive to abusive situations and would likely markedly withdraw from conflict. Her anxiety would limit flexibility. When asked to report how Alicea would react to pressures in work settings, or elsewhere which involved simple routine, or repetitive tasks, Dr. Rodio responded that her anxiety and depression likely would likely worsen and she would likely be unable to focus consistently and productively. Her hallucinations would worsen with stress. (Tr. 311.)

On April 8, 2011, Sarah Stull from Recovery Resources, completed a Daily Activity Questionnaire for the Bureau of Disability Determination. (Tr. 313-314.) She reported that Alicea lives with a friend. She would be unable to live independently due to mental retardation, no income, and no insight into her mental illness. Alicea was noncompliant with appointment times; she had poor attendance. She did not understand things that were told to her. She had very low functioning and processing. (Tr. 313.) When asked to describe plaintiff's abilities to care for her own needs, Stull said

12

that she did not know her abilities to prepare foods, perform household chores, or engage in hobbies. She had good ability to take care of personal hygiene, shop, and drive/take public transportation. She had bad ability to bank and pay bills. (Tr. 314.)

There are treatment records from Recovery Resources from October 2010 to August 2011. Alicea's "sober/clean date" was March 25, 2011. (Tr. 332.) She attended group sessions to help maintain her sobriety, individual counseling, and saw Dr. Rodio every 2-3 months. Throughout her treatment, especially after she stopped using drugs and alcohol in March, Alicea was compliant with taking her medications (Tr. 306-08, 3133, 335-36, 337, 352-55, 357-58, 359, 374-76, 378-79, 380-81, 388-89, 391-92, 394-95, 396-97, 401-02, 407-10, 417-18, 421-22, 430-31, 438-39, 443-44, 447-48, 466-68, 474-77.) She did have trouble making her once weekly meetings with a therapist, though she was compliant with her parole officer and drug testing (Tr. 306-08, 403, 313-14.) In May 2011, a therapist noted that Alicea struggled during the initial stages of the program and had a relapse, but then began to have regular attendance at AA meetings and demonstrated an understanding of her diagnoses and the management of her symptoms. (Tr. 365.) She reported, "I never thought I had a drug use problem. I feel ashamed. . . . I realize I have to do what I have to do." (Tr. 361.)

Alicea had many stressors in her life. In mid-May, she said she was depressed and had gotten into an argument with her boyfriend. She told him not to come around, but he was stalking her. (Tr. 354-55.) Later that month, she said that she had a June court date because "my sister wants custody of my kids." (Tr. 352.) July 11 treatment

13

notes state that Alicea "has an extensive history of being involved in relationships with males where she was the victim of domestic violence." (Tr. 325.) During the summer, her 14 year old daughter became pregnant. Although this was a stressor, she had "a good working relationship with the child's father and his family." (Tr. 316.) On August 4, Alicea said she was interested in getting back together with he ex-boyfriend who had a violent criminal history. (*Id.*)

On May 27, she said that she did not have an AA sponsor and was not working on any steps. She had not taken her medication. She was depressed. (Tr. 350-51.) But on May 31, Alicea was taking her Valium, Prozac and Risperdal and was feeling better. She and her boyfriend were taking time away from each other. (Tr. 347.) On June 8, Alicea was looking for an apartment so she could get her kids back. She was babysitting and had an interview at McDonald's. (Tr. 345-46.)

On July 5, 2011, Alicea "was in a good mood, but was agitated and fidgety." (Tr. 331.) She was receiving food stamps. She did not have a public transportation identification and was not interested in obtaining on because she had transportation. She was in the process of getting a GED. She had looked for employment but was having trouble finding a job because of her criminal conference. (*Id.*) Alicea said that she had apologized to her children, and "it broke me down, big time. It's when I started realizing that I wasn't a mother to them." (Tr. 333.) She accepted that she had a drug problem and needed to stay away from negative people. (*Id.*)

On July 9, Alicea still did not have a sponsor. Her support network was "my

family, my best friends, my kids, my higher power, recovery resources." (Tr. 330.) The therapist noted: "Client verbalizes some insight regarding MI [mental illness] and addiction, but consistent resistance to using recovery tools." (*Id*.) July 11 treatment notes state that Alicea reported that she was "maintaining sobriety and psychiatric stability . . . ." (Tr, 325.) She "was able to identify how her substance use has negatively impacte[d] her financially." (Tr. 326.)

On July 18, Dr. Rodio said that Alicea felt less depressed on her current dose of Prozac. Valium helped her anxiety. She reported a decrease in auditory and visual hallucinations, noting that they are more likely to occur when she is in her bedroom alone. Commotion in the house could stir up the hallucinations. Dr. Rodio diagnosed major depressive disorder with psychotic features, cocaine dependence, alcohol abuse and borderline intellectual functioning and gave a GAF score of 60. (Tr. 322.) A therapist's notes from the same day state that Alicea reported some difficulty concentrating on conversation, which caused her family and friends to think she was ignoring them. Her boyfriend was looking for a double apartment. Her pregnant 13 year old daughter was visiting her on some weekends, and Alicea was "trying to help her out as much as I can." (*Id*.) She said that she had been sober since March 2011. She was not consistently attending AA meetings. (Tr. 318.) On August 16, Alicea had gotten ack together with her ex-boyfriend and was thinking about moving in with him. She was well-dressed and in a positive mood. She continued to need assistance maintaining psychiatric stability. (Tr. 315.)

Alicea also reported feeling less depressed on her medications, although she still had urges to cut herself.(Tr. 322.) That same day, it was noted that Alicea was being terminated from the alcohol and drug services because she reported maintaining sobriety since March 2, 2011. It was noted that Alicea continued to be eligible for mental health services. (Tr. 317.) Alicea returned to Recovery Resources August 2, 2011 and August 16, 2011 for community psychiatric support treatment. (Tr. 315, 316.)

**Court competency evaluation.** On July 15, 2010, Alicea underwent a competency evaluation at the Court Psychiatric Clinic, County of Cuyahoga, Court of Common Pleas. (Tr. 484-490.) During the mental status examination, it was noted that Alicea's statements were simplistic, yet coherent and organized. Alicea reported experiencing auditory hallucinations and seeing shadows. (Tr. 486.) It was noted that Alicea's memory for recent events was slightly impaired. Her attention and concentration skills were mildly impaired. She was unable to perform serial three subtractions. She demonstrated a limited capacity for abstract reasoning. Her judgement for hypothetical situations appeared to be impaired. (Tr. 487.) Alicea was administered the Vocabulary and Matrix Reasoning subtest of the WAIS. She achieved a full scale IQ score of 55, which placed her in the mild mental retardation range. It was the examiner's opinion with ninety-five percent confidence that Alicea's true full scale IQ score fell within the range of 51 to 62. (Id.) Alicea was diagnosed with a major depressive disorder, recurrent, severe with psychotic features; mild mental retardation; and, cocaine

16

dependence. (Tr. 489.) It was further found that Alicea was able to understand the nature and objective of the legal proceedings against her and was able to assist her counsel in her defense. (Tr. 490.)

**Mary K. Hill, Ph.D.** On February 23, 2011, state agency consultant Mary K. Hill, Ph.D. reviewed Alicea's file. She found that, during the period June 15, 2010 to the present, Alicea's impairment should be evaluated under Listing 12.04 and 12.05. Alicea had mild restrictions of activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence or pace; and, no episodes of decompensation. (Tr. 80-81.) Dr. Hill found that, prior to June 15, 2010, there was insufficient evidence to establish the severity of Alicea's allegations. (Tr. 81-82.) It was Dr. Hill's opinion that Alicea was capable of performing one- to two-step tasks in a job without production quotas. She could work in an area on her own or a small group setting where others are not dependent on her for completion of their own tasks. Interaction with others should be superficial. (Tr. 84.)

**Administrative Law Judge's Findings.** The administrative law judge made the following findings:

> 1. Born on December 20, 1975, the claimant had not attained age 22 as of January 1, 1983, the alleged onset date (20 C.F.R. § 404.102, 416.120(c)(4) and 404.350(a)(5)).
> 2. The claimant meets the insured status requirements of the Social Security Act through June 30, 2009.
> 3. The claimant has not engaged in substantial gainful activity since January 1, 1983, the alleged onset date (20 C.F.R. § 404.1571 et seq., and 416.971 et seq.).

> . . .

17

4. The claimant has the following severe impairments: polysubstance abuse disorder, in reported remission, a major depressive disorder with psychotic features, and borderline intellectual functioning (20 C.F.R. § 404.1520(c) and 416.920(c)).

5. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. § Part 404, Subpa11 P, Appendix 1 (20 C.F.R. § 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

. . .

6. The claimant retains the following residual functional capacity. She has no exertional limitations. She is limited to simple, routine, low-stress tasks that do not involve arbitration, negotiation, confrontation, directing the work of others, or being responsible for the safety of others. The claimant cannot perform work activity in a fast-paced production environment. Due to a history of substance abuse, the claimant is precluded from occupational driving and from exposure to workplace hazards, such as unprotected heights and unprotected moving machinery.

. .

7. The claimant has no past relevant work (20 C.F.R. § 404.1565 and 416.965).

8. The claimant was born on December 20, 1975. She was 7 years old on the alleged disability onset date and is 36 years old as this decision is issued, a "younger" person (20 C.F.R. § 404.1563 and 416.963) at all relevant times.

9. The claimant has a limited education and is able to communicate in English (20 C.F.R. § 404.1564 and 416.964).

10. Transferability of job skills is not an issue because the claimant does not have past relevant work (20 C.F.R. § 404.1568 and 416.968).

11. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 C.F.R. § 404.1569, 404.1569(a), 416.969, and 416.969(a)).

. . .

12. The claimant has not been under a disability, as defined in the Social Security Act, from January 1, 1983, through the date of this decision (20 C.F.R. § 404.350(a)(5), 404.1520(g) and 416.920(g)).

(Tr. 14-15, 17, and 19-20.)

**Standard of Review**.  Under the provisions of 42 U.S.C. §405(g), "[t]he findings of the Commissioner as to any fact, if supported by substantial evidence, shall be con-

clusive. . . ."  Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Richardson v. Perales*, 402 U.S. 389, 401 (1971)(quoting *Consolidated Edison Company v. NLRB*, 305 U.S. 197, 229 (1938)).  It is "'more than a mere scintilla.'"  *Id.  LeMaster v. Weinberger*, 533 F.2d 337, 339 (6th Cir. 1976).  The Commissioner's findings of fact must be based upon the record as a whole. *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Houston v. Secretary*, 736 F.2d 365, 366 (6th Cir. 1984); *Fraley v. Secretary*, 733 F.2d 437, 439-440 (6th Cir. 1984).  In determining whether the Commissioner's decision is supported by substantial evidence, the Court must "'take into account whatever in the record fairly detracts from its weight.'"  *Beavers v. Secretary of Health, Education and Welfare*, 577 F.2d 383, 387 (6th Cir. 1978)(quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1950)); *Wages v. Secretary of Health and Human Services*, 755 F.2d 495, 497 (6th Cir. 1985).

**Plaintiff's Arguments.**   Plaintiff argues that the decision of the Commissioner denying benefits should be reversed because:

- She meets the requirements of Listing 12.05C.

- The administrative law judge failed to give sufficient weight to the opinion of Dr. Rodio, Alicea's treating psychiatrist.

**Analysis.** This report and recommendation will consider these two arguments together. First, it will set out the controlling law as to each argument, then turn to a consideration of the merits of the arguments.

**Listing 12.05C.** Listing 12.05C provides in pertinent part:

12.05 Mental retardation: Mental retardation refers to significantly sub-average general intellectual functioning with deficits in adaptive func-tioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.

The required level of severity for this disorder is met when the require-ments in A, B, C, or D are satisfied.
. . .
C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and signif-icant work-related limitation of function.

20 C.F.R. Pt. 404, Subpt. P, App. 1. To meet the listing for mental retardation, an im-

pairment must satisfy both the diagnostic description in the introductory paragraph of §

12.05 and one of the four sets of criteria found in subparagraphs A through D. *Foster v.*

*Halter*, 279 F.3d 348, 354-55 (6th Cir. 2001).

**Treating Doctor: Legal Standard.** A treating doctor's opinion[2] on the issue of

disability is entitled to greater weight than that of a physician who has examined plain-

tiff on only one occasion or who has merely conducted a paper review of the medical

---

[2]The Commissioner's regulations define "medical opinions" as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diag-nosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." 20 C.F.R. § 404.1527(a)(2). Treating sources often express more than one medical opinion, including "at least one diagnosis, a prognosis and an opinion about what the individual can still do." SSR 96-2p, 1996 WL 374188, at *2. When an ad-ministrative law judge fails to give a good reason for rejecting a treator's medical opin-ion, remand is required unless the failure does not ultimately affect the decision, *i.e.,* the error is *de minimus. Wilson,* 378 F.3d at 547. So reversible error is not committed where the treator's opinion "is patently deficient that the Commissioner could not possibly credit it;" the administrative law judge's findings credit the treator's opinion or makes findings consistent with it; or the decision meets the goal of 20 C.F.R. § 1527(d)(2) but does not technically meet all its requirements. *Id. See, Gayheart v. Commissioner of Social Security,* 710 F.3d 365, 380 (6th Cir. 2013).

evidence of record.  20 C.F.R. § 404.1527(d)(1).  *Hurst v. Schweiker*, 725 F.2d 53, 55 (6th Cir. 1984); *Lashley v. Secretary of Health and Human Services*, 708 F.2d 1048, 1054 (6th Cir. 1983).  The Commissioner's regulations explain that Social Security generally gives more weight to a treating doctors' opinions because treators are usually "most able to provide a detailed, longitudinal picture" of the claimant's medical impairments. 20 C.F.R. § 404.1527(d)(2).  When the treating doctor's opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record" the Commissioner "will give it controlling weight. " *Id.*

Even though a claimant's treating physician may be expected to have a greater insight into his patient's condition than a one-time examining physician or a medical adviser, Congress specifically amended the Social Security Act in 1967 to provide that to be disabling an impairment must be "medically determinable." 42 U.S.C. §423(d)(1)(A). Consequently, a treating doctor's opinion does not bind the Commissioner when it is not supported by detailed clinical and diagnostic test evidence. *Warner v. Commissioner of Social Security,* 375 F.3d 387, 390 (6th Cir. 2004)*; Varley v. Secretary of Health and Human Services*, 820 F.2d 777, 779-780 (6th Cir. 1987); *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1983); *Halsey v. Richardson*, 441 F.2d 1230, 1235-1236 (6th Cir. 1971); *Lafoon v. Califano*, 558 F.2d 253, 254-256 (5th Cir. 1975). 20 C.F.R. §§404.1513(b), (c), (d), 404.1526(b), and

21

404.1527(a)(1)[3].

The Commissioner's regulations provide that she will generally "give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you." 20 C.F.R. § 404.1527(d)(1). When a treating source's opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight." 20 C.F.R. § 404.1527(d)(2).

When the treating source's opinion is well-supported by objective medical evidence and is not inconsistent with other substantial evidence, that ends the analysis. 20 C.F.R. § 404.1527(c)(2); Social Security Ruling 96-2p[4]. *Gayheart v. Commissioner of Social Security,* 710 F.3d 365, 375 (6th Cir. 2013). The Commissioner's regulations require decision-makers "to provide 'good reasons' for discounting the weight given to a treating-

---

[3]Section 404.157(a)(1) provides:
You can only be found disabled if you are unable to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. See §404.1505. Your impairment must result from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. See §404.1508.

[4]Social Security Ruling 96-2p provides, in relevant part:
. . .
6.  If a treating source's medical opinion is well-supported and not inconsistent with the other substantial evidence in the case record, it must be given controlling weight; *i.e.*, it must be adopted.

source opinion. [20 C.F.R.] § 404.1527(c)(2)."[5] *Gayheart,* 710 F.3d at 375.

The Commissioner has issued a policy statement, Social Security Ruling 92-6p, to guide decision-makers' assessment of treating-source opinion. It emphasizes:

1. A case cannot be decided in reliance on a medical opinion without some reasonable support for the opinion.

2. Controlling weight may be given only in appropriate circumstances to medical opinions, *i.e.,* opinions on the issue(s) of the nature and severity of an individual's impairment(s), from treating sources.

3. Controlling weight may not be given to a treating source's medical opinion unless the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques.

4. Even if a treating source's medical opinion is well-supported, controlling weight may not be given to the opinion unless it also is "not inconsistent" with the other substantial evidence in the case record.

5. The judgment whether a treating source's medical opinion is well-supported and not inconsistent with the other substantial evidence in the case record requires an understanding of the clinical signs and laboratory findings and what they signify.

6. If a treating source's medical opinion is well-supported and not inconsistent with the other substantial evidence in the case record, it must be given controlling weight; *i.e.,* it must be adopted.

7. A finding that a treating source's medical opinion is not entitled to controlling weight does not mean that the opinion is rejected. It may still be entitled to deference and be adopted by the adjudicator.

The focus at this step is solely on whether the treating-source opinion is well-supported

---

[5]Section 404.1527(c)(2) provides, in relevant part: "We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion."

by objective medical evidence and not inconsistent with other substantial evidence. In making this determination the factors for assessing the *weight* to give to the medical opinions of any medical source, 20 C.F.R. § 404.1527(c), are not used. These come into play only when there are good reasons not to give the treating-source opinion controlling weight.  20 C.F.R. § 404.1527(c)(2)[6]; *Gayheart,* above,710 F.3d at 376, 2013 WL 896255, *10.

    If there are good reasons to find that the treating-source opinion is not controlling, then the decision-maker turns to evaluating all the medical source evidence and determining what weight to assign to each source, including the treating sources[7]. The

_____

   [6]Section 404.1527(c)(2) provides, in relevant part:
   If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight. *When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (c)(2)(I) and (c)(2)(ii) of this* section, as well as the factors in paragraphs (c)(3) through (c)(6) of this section in determining the weight to give the opinion

(Emphasis added.)

   [7]Even when the treating source-opinion is not controlling, it may carry sufficient weight to be adopted by the Commissioner:
   Adjudicators must remember that a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527 and 416.927. In many cases, a treating source's medical opinion will be entitled to the

Commissioner's regulations require the decision-maker to considers the length of the relationship and frequency of examination; nature and extent of the treatment relationship; how well-supported the opinion is by medical signs and laboratory findings; its consistency with the record as a whole; the treating source's specialization; the source's familiarity with the Social Security program and understanding of its evidentiary requirements; and the extent to which the source is familiar with other information in the case record relevant to decision. 20 C.F.R. § 404.1527(c)(1) through (6). Subject to these guidelines, the Commissioner is the one responsible for determining whether a claimant is disabled. 20 C.F.R. § 404.1527(e).

The case law is consistent with the principals set out in Social Security Ruling 96-2p. A broad conclusory statement of a treating physician that his patient is disabled is not controlling. *Garner v. Heckler*, 745 F.2d 383, 391 (6th Cir. 1984). For the treating physician's opinion to have controlling weight it must have "sufficient data to support the diagnosis." *Kirk v. Secretary of Health and Human Services*, 667 F.2d 524, 536, 538 (6th Cir. 1981); *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985). The Commissioner may reject the treating doctor's opinions when "good reasons are identified for not accepting them." *Hall v. Bowen*, 837 F.2d 272, 276 (6th Cir. 1988); *Wilson v. Commissioner of Social Security,* 378 F.3d 541, 544 (6th Cir. 2004). These reasons must be "supported by the

---

greatest weight and should be adopted, even if it does not meet the test for controlling weight.

SOCIAL SECURITY RULING 96-2p.

evidence in the case record, and must be sufficiently specific to make clear to any sub-sequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." Soc. Sec. Rul. No. 96-2p, 1996 WL 374188 at *5; *Rogers v. Commissioner of Social Security,* 486 F.3d 234, 242 (6th Cir. 2007). This procedural requirement "ensures that the ALJ applies the treating physician rule and permits meaningful review of the ADMINISTRATIVE LAW JUDGE's application of the rule." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).Moreover, the conflicting substantial evidence "must consist of more than the medical opinions of nontreating and nonexamining doctors." *Gayheart*, 710 at 377. Even when the Commissioner determines not to give a treator's opinion controlling weight, the decision-maker must evaluate the treator's opinion using the factors set out in 20 C.F.R. § 404.1527(d)(2). *Wilson,* 378 F.3d at 544; *Hensley v. Astrue,* 573 F.3d 263, 266 (6th Cir. 2009). There remains a rebuttable presumption that the treating physician's opinion "is entitled to great deference." *Rogers v. Commissioner of Social Security,* 486 F.3d at 242; *Hensley*, above. The Commissioner makes the final decision on the ultimate issue of disability. *Warner v. Commissioner of Social Security,* 375 F.3d at 390; *Walker v. Secretary of Health & Human Services,* 980 F.2d 1066, 1070 (6th Cir. 1992); *Duncan v. Secretary of Health and Human Services*, 801 F.2d 847, 855 (6th Cir. 1986); *Harris v. Heckler*, 756 F.2d at 435; *Watkins v. Schweiker*, 667 F.2d 954, 958 n.1 (11th Cir. 1982).

**<u>Discussion and decision</u>**.

The administrative law judge carefully considered the evidence of record when

determining that plaintiff Alicea did not meet or equal Listing 12.05C:

> Borderline intellectual functioning is considered under listing 12.05. The threshold requirement is evidence of significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.

> There is no evidence of deficits in adaptive functioning in this case. The claimant testified that she was in special education classes before her mother removed her from school, but there is no evidence of record establishing deficits prior to age 22. The claimant's ability to function is best evidenced by the fact that she has a significant work history, including work activity from 2000-2004 and as recently as 2010, albeit not at the level of substantial gainful activity. (Exhibit 5D). In addition to her work activity, the claimant has a significant range of daily activity, including baby-sitting for her roommate's infant and performing household chores. (Exhibit IF).

> The threshold requirement not having been satisfied, the requirements in paragraphs A, B, C, and D are not relevant.

> The record contains evidence of two intellectual functioning tests. The first was performed on July 15, 2010, during a court-ordered psychological examination in relation to criminal proceedings. This test yielded a full-scale IQ score of 55, which was within the mild mental retardation range of intellectual functioning. (Exhibit 8F, p. 4).

> Mitchell Wax, Ph.D. performed subsequent intellectual testing on October 14, 2010, during the consultative examination with requested by the Bureau of Disability Determination . Dr. Wax doubted the validity of the earlier court-ordered testing and regarded the results of his own testing as "suspicious," inasmuch as the claimant appeared to be functioning at a much higher level than the test results indicated. . . .

(Tr. 15.)

As the administrative law judge found, although plaintiff had a low IQ score, she was not diagnosed with mental retardation. Dr. Wax determined that Plaintiff was functioning at a much higher level than her test results indicated. (Tr. 15, 291-92.) Furt-

27

her, although Dr. Rodio, Alicea's treating psychiatrist, originally adopted a diagnosis of mild mental retardation based on the court ordered psychological evaluation, after treating her, he revised his diagnosis to borderline intellectual functioning. (Tr. 319 and 322.). Because Listing 12.05C requires a diagnosis of mental retardation, a diagnosis of borderline intellectual functioning does not meet or equal the listing. *See Cooper v. Comm'r of Soc. Sec.*, 217 F. App'x 450, 452 (6th Cir. 2007); *West v. Comm'r of Soc. Sec.*, 240 F. App'x 692, 698 (6th Cir. 2007); *Daniels v. Comm'r of Soc. Sec.*, 70 F. Appp'x 868, 872-73 (6th Cir. 2003). In addition, Dr. Rodio's assessment that plaintiff had a GAF score of 60 supports the administrative law judge's conclusion that she had only mild limitations in functioning. (Tr. 445-46.)

For the above reasons, the Magistrate Judge concludes that there is substantial evidence in the record supporting the Commissioner's decision that plaintiff Alicea did not meet or equal Listing 12.05C and did not err in his analysis of the opinions of her treating psychiatrist, Dr. Rodio.

Accordingly, it is **RECOMMENDED** that the decision of the Commissioner of Social Security be **AFFIRMED.** It is **FURTHER RECOMMENDED** judgment be entered for defendant.

If any party objects to this Report and Recommendation, that party may, within fourten (14) days, file and serve on all parties a motion for reconsideration by the Court, specifically designating this Report and Recommendation, and the part thereof in question, as well as the basis for objection thereto. 28 U.S.C. §636(b)(1)(B); Rule 72(b), Fed. R.

Civ. P.

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to *de novo* review by the District Judge and waiver of the right to appeal the judgment of the District Court.  *Thomas v. Arn*, 474 U.S. 140, 150-52 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also, Small v. Secretary of Health and Human Services*, 892 F.2d 15, 16 (2d Cir. 1989).

s/Mark R. Abel
United States Magistrate Judge